**In re ENRON CORP., et al., Debtors.**

**No. 01–16034 (AJG).**

United States Bankruptcy Court, S.D. New York.

June 21, 2002.

Weil, Gotshal & Manges LLP, Martin J. Bienenstock, Brian S. Rosen, Marshall C. Turner, of counsel, New York City, for Debtors.

Milbank, Tweed, Hadley & McCloy LLP, Luc A. Despins, Douglas W. Henkin, of counsel, New York City, for Official Committee of Unsecured Creditors.

Office of the United States Trustee, Mary Elizabeth Tom, Assistant United

**674**

States Trustee, Greg Zipes, Trial Attorney, New York City.

Thompson & Knight LLP, Rhett G. Campbell, David M. Bennett, Judith W. Ross, of counsel, Houston, TX, for Dunhill and Petro–Hunt.

Carter, Ledyard & Milburn, Aaron R. Cahn, of counsel, New York City, for Petro–Hunt.

Barnet B. Skelton, Jr., P.C., Barnet B. Skelton, of counsel, Houston, TX, for Southern Ute Indian Tribe.

Akin, Gump, Strauss, Hauer & Feld LLP, H. Rey Stroube, III, of counsel, Houston, TX, for Dynegy and Statex Petroleum, Packaged Ice and EC Power.

Fulbright & Jaworski LLP, David A. Rosenzweig, of counsel, New York City, for El Paso Merchant Energy.

Reed Smith LLP, Deborah A. Reperowitz, of counsel, New York City, for The Wiser Oil Company.

Kasowitz, Benson, Torres & Friedman LLP, David M. Friedman, Richard F. Casher, Robert M. Novick, of counsel, New York City, for EDO Creditors.

Kelley Drye & Warren LLP, Mark I. Bane, Mark R. Somerstein, of counsel, New York City, for JPMorgan Chase Bank, as Agent.

White & Case LLP, John S. Willems, Judd Lawler, Kara F. Headly, of counsel, New York City, for Ad Hoc Committee of Energy Merchants—Creditors.

White & Case LLP, Thomas E. Lauria, Gerard Uzzi, of counsel, Miami, FL, for Ad Hoc Committee of Energy Merchants—Creditors.

Barry A. Brown, P.C., Barry A. Brown, of counsel, Houston, TX, for Upstream Energy Services.

Jenkens & Gilchrist Parker Chapin LLP, Hollace T. Cohen, Jennifer L. Saffer, of counsel, New York City, for Ad Hoc Committee of Yosemite/CLN Noteholders.

Hunton & Williams, Joseph J. Saltarelli, Benjamin C. Ackerly, of counsel, New York City, for Cinergy Services, Inc.

Gardere Wynne Sewel LLP, John C. Nabors, Deirdre B. Ruckman, Michael P. Cooley, of counsel, Dallas, TX, for EXCO Resources, Inc.

Stutman, Treister & Glatt, Isaac M. Pachulski, of counsel, Los Angeles, CA, for Baupost Group, L.L.C. and Racepoint Partners, L.L.C.

Hahn & Hessen LLP, Rosanne Thomas Matzat, of counsel, New York City, for Powerex Corp.

Simpson Thacher & Bartlett, Jeffrey L. Cohen, of counsel, New York City, for Duke Energy Trading and Marketing, LLC.

Strook & Strook & Lavan LLP, Lewis Kruger, of counsel, New York City, for ABN AMRO.

Pryor Cashman Sherman & Flynn LLP, Edward M. Fox, Jr., of counsel, New York City, for National City Bank.

Paul, Hastings, Janofsky & Walker LLP (Appeared via telephone), Madlyn Primoff, of counsel, New York City, for GECC.

## MEMORANDUM DECISION REGARDING MOTIONS TO APPOINT AN ENRON NORTH AMERICA COMMITTEE AND AN ENERGY TRADERS' COMMITTEE AND ALTERNATIVE MOTION OF UPSTREAM ENERGY SERVICES TO REQUIRE ENRON NORTH AMERICA AS DEBTOR IN POSSESSION TO OBTAIN SEPARATE COUNSEL

ARTHUR J. GONZALEZ, Bankruptcy Judge.

### INTRODUCTION

Before the Court is the motion, dated February 7, 2002, of the Ad Hoc Com-

mittee of Energy Merchants (the "Ad Hoc Committee") for an order directing the United States Trustee (the "U.S. Trustee") to appoint an additional committee of energy merchants (the "Ad Hoc Motion"); motion, dated February 8, 2002, of Pioneer Natural Resources, Dunhill Resources I, LLC, Crosstex Energy Services Limited, Tenaska Marketing Ventures, Forest Oil Corp., Devon Energy Corporation, Petro–Hunt, LLC and Spinnaker Exploration Company (collectively, the "Dunhill Group") to direct United States Trustee to appoint a separate Enron North America ("ENA") creditors' committee (the "Dunhill Motion"); joinder by EXCO Resources, Inc. ("EXCO") in support of Dunhill Motion (not dated, but filed on docket on February 19, 2002); objection, dated February 22, 2002, of U.S. Trustee to motions of certain energy merchants and ENA creditors for orders directing the appointment of additional committees; joinder by Cinergy Entities, Inc. ("Cinergy"), dated February 22, 2002, in support of the Ad Hoc Motion; objection, dated February 25, 2002, of the Official Committee of Unsecured Creditors (the "Creditors' Committee") to motions for appointment of a separate trade creditor or energy merchants committee; joinder by The Wiser Oil Company ("Wiser Oil"), dated February 25, 2002, in support of Dunhill Motion; omnibus objection of JPMorgan Chase Bank ("JPMorgan"), dated February 25, 2002, to the Ad Hoc Motion and to the Dunhill Motion; response, dated February 25, 2002, of Cinergy in support of the Ad Hoc Motion; response, dated February 26, 2002, of Appaloosa Management, L.P., Angelo, Gordon & Co. and Elliot Associates, L.P. (collectively, the "EDO Creditors"), in support of, and joinder in, Dunhill Motion (the "EDO Joinder"); objection of Enron Corp. and its affiliated debtor entities (the "Debtors"), dated February 26, 2002, to Ad Hoc Motion and to Dunhill Motion; joinder and supplement of Southern UTE Indian Tribe, dated February 26, 2002, to Dunhill Motion; motion, dated April 17, 2002, of Upstream Energy Services LLC ("UES") to require appointment of a separate creditors' committee for ENA and joinder in pending similar requests, and alternative motion to require ENA as debtor in possession to obtain separate counsel (the "UES Motion");[1] initial objections, dated May 9, 2002, of ENA to UES Motion; supplemental memorandum, dated May 22, 2002, of the Dunhill Group;[2] statement, dated May 22, 2002, of the Ad Hoc Committee of Yosemite/CLN Noteholders (the "Ad Hoc Committee of Noteholders") in support of and joinder in Dunhill Motion and EDO Joinder; supplemental motion, dated May 22, 2002, of Cinergy for an order directing the U.S. Trustee to appoint a separate official committee of energy trading creditors; supplemental response, dated May 22, 2002, of EDO Creditors in support of, and joinder in, Dunhill Motion; brief, dated May 22, 2002, of EXCO Resources, Inc. in support of motions to create a

1. This Court will treat the UES Motion as a joinder to the previously filed motions for an additional committee of ENA creditors. UES' request for separate counsel for ENA will be addressed in the discussion hereinafter.

2. The supplemental memorandum of the Dunhill Group includes certain entities that were not set forth on the original motion filed on February 8, 2002. Those additional entitles include Hilcorp Energy I, L.P., Pure Resources, Inc., Aspect Energy, LLC, Equiva Trading Company, Hilcorp Energy, L.P., Hunt Petroleum Corporation, KCS Energy, Inc., Magnum Hunter Resources, Inc., Markwest Energy, Inc., Noble Gas Marketing, Inc., Southwest Royalties, Inc., Tri Union Development Corporation, Pogo Producing Company and Encore Acquisition.

separate creditors' committee for ENA; supplemental submission, dated May 23, 2002, of the Ad Hoc Committee; supplemental objection, dated June 3, 2002, of the U.S. Trustee to motions of certain energy merchants and ENA creditors for orders directing the appointment of additional committees; ENA and its affiliated Debtor entities' reply, dated June 3, 2002, to motions, supplemental briefs, and joinder seeking appointment of an ENA creditors' committee; supplemental objection, dated June 3, 2002, of Creditors' Committee in further opposition to motions seeking, *inter alia*, appointment of a separate creditors' committee for ENA; memorandum, dated June 3, 2002, of the Baupost Group, L.L.C. and Racepoint Partners, L.L.C. (the "Baupost Group") in opposition to the supplemental memoranda and responses filed by various ENA creditors and creditor groups in support of the appointment of a separate committee of ENA creditors.[3]

In addition to the aforementioned pleadings, the following parties entered their appearance and presented argument for the record: Powerex Corp., Duke Energy Trading and Marketing, LLC ("Duke En-

ergy"), ABN AMRO Bank and National City Bank.

This Court heard oral argument on the motions and opposition thereto on February 27, 2002.[4] Following the hearing, the Court stated that it would await the report of the ENA Examiner[5] before deciding the motions. Thereafter, following the submission of a report filed by the ENA Examiner on April 9, 2002, the Court permitted additional submissions, with final papers due by June 3, 2002. The issues before the Court are whether the Court should direct the U.S. Trustee to (1) appoint an unsecured creditors' committee comprised of ENA creditors, (2) appoint an additional committee of unsecured creditors comprised of energy traders and (3) require ENA as Debtor in Possession to obtain separate counsel.[6] The Court finds and concludes as follows.

### FACTS

The above-captioned case was commenced on December 2, 2001 under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code").[7] Enron Corp. directly or indirectly owns, controls or holds, with power to

---

3. The Court will hereinafter refer to those in support of additional committees, in the aggregate, as the "Movants." The Court will refer to those in favor of a separate committee of creditors of the energy Debtors as the "Energy Traders" and those in support of a separate committee of creditors of ENA as the "ENA Creditors." Energy traders as a whole will be referred to as "energy traders" and creditors of ENA as a whole will be referred to as "ENA creditors."

4. The record of the hearing includes the entire record of the case.

5. The Court appointed an examiner for the ENA bankruptcy estate. *See infra*. In certain instances, the Court will refer to the ENA Examiner simply as the "Examiner," such as when quoting language from prior orders.

On May 24, 2002 the Court appointed an examiner for Enron Corp. who will be referred to by the Court as the "Enron Corp. Examiner." Collectively, they will be referred to as the "Examiners."

6. It is apparent to the Court that while some of the Movants seek appointment of an energy traders' committee and some of the Movants seek appointment of an ENA creditors' committee, such appointment is mutually exclusive due to the inevitable overlap of creditors. Additionally, EXCO argues that pursuant to 11 U.S.C. § 1102(a)(1) a committee for ENA, as a separate Debtor, should be appointed.

7. Additional cases have been filed periodically thereafter by related Debtors. These cases are jointly administered under the Enron Corp. caption.

vote, 100% of the voting securities of ENA. ENA's business includes the trading of such commodities as electric power and natural gas and the development of power projects. In the schedules filed on June 17, 2002 (the "Schedules"), ENA reported total assets of over $28.3 billion based upon "net book value" and total debt of over $20.6 billion, not taking into consideration those items listed as "unknown." Those Debtors that are involved in trading are ENA, Enron Power Marketing, Inc. and Enron Energy Services, Inc. (collectively, the "Trading Debtors").

The U.S. Trustee held an organizational meeting on December 12, 2001, for the appointment of a creditors' committee. Various constituencies attended, some seeking membership on the creditors' committee as well as the formation of separate committees. Pursuant to 11 U.S.C. § 1102(a) and (b), the U.S. Trustee appointed a creditors' committee to represent the interests of all unsecured creditors. The Creditors' Committee was initially comprised as follows:

1. JPMorgan Chase & Co. (formerly Chase Manhattan Bank)
2. Citigroup/Citibank
3. ABN AMRO Bank
4. Credit Lyonnais New York Branch
5. Credit Suisse First Boston
6. National City Bank, as Indenture Trustee
7. Silvercreek Management, Inc.
8. Oaktree Capital Management, LLC
9. Wells Fargo Bank Minnesota, N.A., as Indenture Trustee
10. The Bank of New York, as Indenture Trustee
11. St. Paul Fire and Marine Insurance Company

12. National Energy Group, Inc.
13. Duke Energy Trading and Marketing, LLC
14. Mr. Michael P. Moran, individually and as representative
15. The Williams Companies, Inc.

Wells Fargo Bank Minnesota, N.A., as Indenture Trustee, and The Williams Companies, Inc. ("Williams Companies"), are the co-chairs of the Creditors' Committee. Citigroup/Citibank and Mr. Moran have since resigned. To date, no additional members have been appointed, thus, there are now thirteen members of the Creditors' Committee.

Eleven of the thirteen members are creditors with claims against ENA (or the Trading Debtors). Three of those members have claims solely against the Trading Debtors.[8] On January 17, 2002, certain Energy Traders moved to (i) except ENA from the Debtors' centralized cash management system; (ii) direct ENA to implement a new cash management system; and (iii) provide an accounting. The Ad Hoc Committee and others joined in the motion. The Movants argued, *inter alia*, that there was no assurance that either the significant amounts Enron Corp. had transferred or would disburse as intercompany loans could ever be repaid or that the amounts ENA had transferred would be repaid.

Prior to the petition date, ENA revenues, like those of other Enron Corp. subsidiaries, were transferred or "swept" on a daily basis from ENA bank accounts into an Enron Corp. concentration account. This practice was continued in accordance with the December 3, 2001 order granting the motion to authorize the continued use

---

**8.** It is unclear per the Schedules whether any affiliates of the Williams Companies (an energy trader and member of the Creditors' Committee) have claims against Enron Corp. relating to energy transactions.

of existing bank accounts, cash management system, checks and business forms (the "Cash Management Order"). On February 25, 2002, the Court entered an Amended Order Authorizing the Continued Use of Existing Bank Accounts, Cash Management System, Check and Business Forms, and Granting Inter Company Superpriority Claims, Pursuant to 11 U.S.C. §§ 361(e), 364 and 507(b) as Adequate Protection (the "Amended Cash Management Order"). In the Amended Cash Management Order, *inter alia*, the Court ordered a 30–day prohibition on cash sweeps from ENA to Enron Corp. and granted adequate protection to each Debtor that transferred property postpetition to or for the benefit of any other Debtor, including the granting of "Junior Reimbursement Claims" (claims against the beneficiary Debtor for the fair value of any property or benefit transferred) and "Junior Liens" (liens on all property of a beneficiary Debtor's estate that secured the Junior Reimbursement Claims). The 30–day prohibition has since been extended indefinitely.

Additional protections were delineated, including additional adequate protection for ENA, as follows: [9]

i. For 30 days after entry of the Amended Cash Management Order, there were to be no transfers of ENA's cash;

ii. A limitation was imposed on the maximum balance of net ENA postpetition intercompany receivables from all other Debtors, taken as a whole;

iii. An ENA representative was added to the Debtors' Cash Approval Committee and the Bankruptcy Transaction Review Committee (the "BTRC").[10]

iv. The ENA representative was directed to consult with the Examiner on matters pertaining to ENA and reviewed by the Committee; and

v. Within five business days after entry of the Amended Cash Management Order, ENA was directed to establish a separate cash concentration account in accordance with section 5.07 of the DIP Credit Agreement.

During the period between December 20, 2001 and January 29, 2002, various parties representing the Movants wrote to the U.S. Trustee requesting the appointment of separate committees as set forth herein. By letters dated February 5, 2002 and February 6, 2002, the U.S. Trustee denied the requests, and the aforementioned motions were filed.

By orders dated February 21, 2002 and March 6, 2002, the Court appointed the ENA Examiner pursuant to § 1106(b) to investigate and file an interim report (the "Interim Report") concerning:

i. The cash and cash equivalent assets of ENA;

ii. Matters relating to intercompany transfers between ENA and its parent, Enron Corp.; and

iii. The allocation of certain overhead expenses to ENA.

The Examiner was also directed, *inter alia*, to determine in connection with ENA's continued participation in the cash management system whether:

i. Sufficient assets exist subject to the Junior Liens for repayment of the

---

9. Refer to orders referenced for exact definitions of defined terms therein.

10. The BTRC is also referred to as the Risk Assessment Committee. The BTRC, comprised of representatives from various departments of Enron Corp., including Corporate Development, Tax and Legal, reviews and evaluates transactions.

ENA inter-company transfers that have been or may be made to other Debtors; and

ii. To recommend an allocation of "certain overhead costs to ENA."

Furthermore, the Examiner was given a continuing oversight duty and directed to:

i. File weekly reports with the Court listing all deposits and reimbursements made into and out of the consolidation account;

ii. File monthly reports regarding the status of ENA's gross and net collections, expenditures and assets and liabilities;

iii. Participate in all meetings of the Enron Cash Management Committee and Risk Assessment Committee which are responsible for the review and approval of ENA expenditures; and

iv. Report immediately to the Court any improper ENA expenditures.

The ENA Examiner's April 9, 2002 report concluded as follows:

i. It is highly likely that more than sufficient assets exist subject to the Junior Liens for repayment of ENA postpetition transfers to Enron Corp.;

ii. Enron Corp. appears to have sufficient cash on hand for 90 days and maybe much longer;

iii. The Junior Liens, Junior Reimbursement Claims, the Cash Management Committee and BTRC procedures and the Examiner's monitoring provide adequate legal and supervisory protection; and

iv. The standard the Examiner utilized to determine whether any ENA expenditure was improper is whether they were calculated to preserve or enhance the value of the ENA estate within a reasonable timeframe; he found that none were improper.

The Examiner further noted that he needed to complete an evaluation of an appropriate allocation of certain overhead expenses to ENA, that there may be some cash flows that still need to be evaluated, that a review of the relationship between ENA and its subsidiaries was still outstanding, and that a valuation of the Trading Book [11] still needed to be completed.

Following the submission of the Interim Report, the ENA Examiner filed weekly reports including a list of all deposits and disbursements made into and out of the consolidation account. On May 3, 2002, the ENA Examiner submitted his first monthly report regarding the status of ENA cash, including gross and net collection and expenditures, and the status of ENA assets and liabilities. The ENA Examiner continued to find no improper expenditures.

On May 8, 2002, the Court entered an Order Expanding Duties of Enron North America Corp. Examiner. The May 8, 2002 order provided, in relevant part, as follows:

ORDERED that the ENA Cash Freeze be extended permanently (the "Freeze Period") subject to the right of ENA to apply to terminate the ENA Cash Freeze on at least 20 day's [sic] notice to the ENA Examiner and other parties in interest; and it is further

ORDERED that through the Freeze Period, the Examiner meet with the parties to discuss a follow-up report regarding a proposed methodology for repayment of the Net Intercompany Receivable and whether repayment may occur in connection with the treatment of prepetition intercompany claims be-

---

11. The "Trading Book" is the book of business maintained by ENA.

tween Enron Corp. and ENA in a chapter 11 plan; and it is further

ORDERED that through the Freeze Period, the Examiner file a follow-up report regarding intercompany advances (i) between ENA and its subsidiaries and Enron Corp. and (ii) between ENA and its subsidiaries, if any, and their impact on the individual ENA entities and on repayment of the Net Intercompany Receivable; and it is further

ORDERED that the Examiner continue to monitor the BTRC with respect to Enron's credit valuation and other procedures regarding transfers to Debtors and non-Debtors; and it is further

ORDERED that the Examiner report on his assessment of the Debtors' proposed overhead cost allocation and, if necessary or appropriate, recommend amendments on or before July 22, 2002 as long as the Debtors propose their overhead allocation methods on or before July 8, 2002; and it is further

ORDERED that the Examiner investigate and file a follow-up report on cash sweeps from ENA's subsidiaries to ENA and payments from ENA to its subsidiaries, including a recommendation as to whether such transactions should continue and whether a Cash Freeze should apply thereto; and it is further

ORDERED that in the event the Court approves a modification to the Debtors' DIP financing, the Examiner file a supplemental report addressing how such modification affects (i) ENA and (ii) the recommendations included in the Report and in any subsequent report; and it is further

ORDERED that with ENA in the process of winding down the Trading Book and selling its other assets, the ENA Examiner shall work with the Debtors, the statutory creditors' committee (the "Committee"), and other parties in interest to facilitate the chapter 11 plan process for ENA and its subsidiaries as expeditiously as possible; and it is further

ORDERED that this Order is without prejudice to the rights of any party in interest raising substantive consolidation claims in respect of any Debtor; and it is further

ORDERED that the Examiner investigate intercompany claims and/or transfers between ENA and Enron Natural Gas Marketing Corp. ("ENGMC"), and ENGMC and other affiliates of Enron, and consideration, if any, for same; and it is further

ORDERED that, prior to resolution by trial or otherwise of the action entitled *JPMorgan Chase Bank v. Liberty Mutual Ins. Co., et al.,* 01 Civ. 11523(JSR) pending in the United States District Court for the Southern District of New York (the "Surety Litigation"), the Examiner, unless otherwise ordered by the Court, shall not conduct any discovery regarding any matter relating to Mahonia Limited or Mahonia Natural Gas Limited (collectively, "Mahonia"), including, without limitation, transactions between Mahonia and either of ENA or ENGMC, as the case may be, relating to forward contracts involving the sale and delivery of oil and natural gas and the proceeds of such transactions; provided however, that the Examiner may request from parties to the Surety Litigation copies of documents produced in discovery in the Surety Litigation and the transcripts of depositions conducted in the Surety Litigation, to the extent that they pertain to the intercompany claims or transfers or to the consideration therefor, as described in the preceding paragraph and in accordance with and subject to any protective order obtained in the Surety Litigation and

any other appropriate confidentiality protections; and it is further

ORDERED that the Examiner and any examiner appointed for Enron Corp. (collectively, the "Examiners") shall consult with one another to avoid duplication of efforts regarding the scope of any investigation to be conducted, and should endeavor not to create situations in which both Examiners are requesting potentially overlapping discovery from any third party witness; and it is further

ORDERED that the Examiner, to the extent possible, shall avoid duplication of effort of the Debtors and any official Committee in connection with investigations to be pursued; and it is further

ORDERED that the Examiner shall, on or before August 15, 2002 file a written report regarding the status of his investigations set forth herein.

On June 4, 2002, the ENA Examiner submitted his second monthly report in which he stated that he was still waiting for certain financial information, which would be included in future monthly reports. Nevertheless, he was still able to report preliminarily on the status of ENA cash, assets and liabilities as of May 17, 2002, and again cited no improper expenditures. He noted that ENA is in the process of selling certain electric power and natural gas contracts at auction. He further discussed entry into hedge contracts, the effect of certain trading memoranda, and other ENA non-cash assets. The ENA Examiner stated that the Schedules are due on June 17, 2002, and he will then report following their submission.[12]

Much of the initial argument in favor of appointing additional committees centered upon skepticism and suspicion as to cash management (including cash sweep and inter-company claims issues), postpetition financing and the sale of the wholesale trading business to UBS AG[13] ("UBS") on January 22, 2002.

Additionally, those that support the creation of a separate committee of ENA creditors argue that ENA has generated the vast majority of cash flow and has the vast majority of assets.[14] The Movants cite concern that value will flow up and out of the ENA estate and never be recovered. The beneficial holders of in excess of $900 million of claims against ENA, arising from holdings of certain securities,[15] argue that the U.S. Trustee was not aware of the existence of these claims when she denied the request for an ENA Committee, and that it is improper to appoint a single committee where the creditors have dealt with the Debtors as an economic unit. Some of the Movants also cite to the disparate interests of the ENA creditors versus that of Enron Corp.'s creditors in that ENA is in liquidation versus reorganization.

The initial arguments in support of an energy traders' committee note, primarily, that the trading business is the primary source of cash flow, that their claims are substantially different from that of the financial creditors, that the claims of the creditors of the non-Trading Debtors are structurally subordinate to the claims of the creditors of the Trading Debtors, that the Creditors' Committee has divided loyalties, and that the Creditors' Committee

---

12. The Schedules were filed, but the ENA Examiner has not yet filed a supplemental report.

13. UBS Warburg is the parent company.

14. Many of the Movants in support of an ENA Committee do not support the formation of an Energy Traders' Committee.

15. These securities are guaranteed by Enron Corp.

is dominated by financial creditors of the "have not" Debtors.

Initial oppositions note that the current composition of the Creditors' Committee provides adequate representation in that three of the members are energy traders (one is the co-chair), and eleven members, including the energy traders, are ENA creditors. The opposing parties further argue that the Creditors' Committee owes a fiduciary duty to all unsecured creditors, and there has been no showing of a breach of such duty. All Creditors' Committee members (with only one exception) have retained their own counsel.[16] Furthermore, an additional committee would create overlapping interests to the same, or even greater, degree.

The Creditors' Committee voted unanimously to object to the motions. In fact, at least four members of the Creditors' Committee, JPMorgan (an ENA Creditor), Duke Energy (an Energy Trader), National City Bank (an Indenture Trustee with ENA claims)[17] and ABN AMRO (an ENA Creditor) objected to the Motions in their individual capacities. Duke Energy, National City Bank and ABN AMRO did not file pleadings but made an appearance during oral argument on the motions.

JPMorgan, as agent for an aggregate group of lenders, represents $1.5 billion in claims against ENA. JPMorgan argues, *inter alia*, that the Movants have not demonstrated that the unsecured claims they hold are any different from the unsecured claims of the existing members of the Creditors' Committee. Furthermore, JPMorgan stated on the record of the

hearing that it reserves the right to seek appointment to any committee based on the size of its claim. Duke Energy's claim arises out of forward contracts and swaps with the Trading Debtors. Duke Energy stated on the record of the hearing that, as one of the largest energy companies in the country, it has carefully considered the existing Creditors' Committee structure and determined that it is appropriate and should be maintained. ABN AMRO, as a major creditor of ENA and a creditor of Enron Corp. and other Debtors and non-Debtor affiliates, noted that the Creditors' Committee's goal has been to maximize value of the assets, that it is discharging such duties, and it would be too costly to appoint a separate committee. Finally, National City Bank noted that the Creditors' Committee is properly balanced as currently comprised.

The Creditors' Committee contends that it has discharged, and will continue to discharge, its fiduciary duty to protect the interests of all unsecured creditors. The Creditors' Committee further notes that in the aggregate, the members of the Creditors' Committee have several billion dollars of claims against the Trading Debtors.[18] Finally, a subcommittee has been formed to review and analyze the terms of the DIP loan, including mechanisms to protect each estate.

The Debtors note in opposition that the composition of the Creditors' Committee is diverse, and that trading-related creditors comprise 20% of the membership, even though the energy trading business repre-

---

16. This was represented by conflicts counsel for the Creditors' Committee at the disqualification hearing of Milbank, Tweed, Hadley & McCloy, LLP, as counsel to the Creditors' Committee held on May 15, 2002.

17. These claims may be guarantied by Enron Corp.

18. This number has been reduced due to Citibank's resignation. Nevertheless, JPMorgan's claims, as agent, aggregate at least $1.5 billion. Williams Companies, Duke Energy and National Energy Group also have substantial claims.

sents a small fraction of the Debtors.[19] None of these creditors on the Creditors' Committee have raised concerns about the conduct of the Creditors' Committee, and the focus has been to protect the Debtors' energy trading operations and generate the highest possible value.

Following the filing of the ENA Examiner's reports, several parties submitted additional pleadings in further support or opposition to the motions to appoint additional committees. The arguments raised in these pleadings were varied, but a common theme throughout were issues relating to the formation and timing of plans of reorganization, including the filing by the Debtors of their business plan (the "OpCo Plan")[20], overhead allocation of expenses, and a potential divergence of interests regarding substantive consolidation. Many other issues raised were creditor specific and will be addressed in the Court's discussion.

The U.S. Trustee renewed her previous objection but also noted that the ENA Examiner provides an additional layer of assurance that the interests of ENA and ENA related creditors are being safeguarded. The Debtors note that many of the Movants' arguments are speculative, and that for each conflict the Movants have been adequately represented and heard. The Creditors' Committee cites (1) the broad role of the ENA Examiner; (2) that it is still reviewing the OpCo Plan and has yet to take a position; and (3) that it continues to exercise its fiduciary duty and to investigate allegations of any improper trading practices and whether valid claims could be asserted (as raised in some of the Movants' pleadings). The objections further note that the creation of additional committees would not be without its own internal conflicts.

## STANDARD OF REVIEW

■ The Court will first consider the standard of review it should apply to the U.S. Trustee's decision not to appoint an additional committee of ENA creditors or of energy traders. The Movants contend that this Court's review is *de novo*, and the U.S. Trustee urges a more limited scope of review.

The decision whether to appoint an additional committee is governed by 11 U.S.C. § 1102(a) of the Bankruptcy Code. Section 1102(a) provides as follows:

(1) As soon as practicable after the order for relief under chapter 11 of this title, the United States Trustee shall appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the United States Trustee deems appropriate;

(2) On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure the adequate representation of creditors or of equity security holders. The United States Trustee shall appoint any such committee.

11 U.S.C. § 1102. The legislative history of § 1102 provides that:

Section [221] amends 11 U.S.C. 1102 to transfer the authority to appoint the Chapter 11 committee of unsecured grated asset portfolio from the bankruptcy estate in which it has been proposed that certain assets will be sold and the remaining assets will be liquidated.

---

**19.** There are sixty-eight Debtors as of the date of this decision.

**20.** The OpCo Plan, filed on May 3, 2002, proposes the formation of OpCo Energy Company to effectuate the separation of an inte-

creditors from the court to the United States Trustee, as it is an administrative task. The court still retains the authority to order the appointment of such additional committees as are necessary, but the U.S. Trustee has the authority to actually appoint these committees once the court has ordered.

H.R.Rep. No. 99–764, 99th Cong.2d Sess. 28 (1986), U.S.Code Cong. & Admin.News 1986, pp. 5227, 5240–41; *In re Texaco, Inc.*, 79 B.R. 560, 567 (Bankr.S.D.N.Y. 1987).

Section 1102(a) was amended against the backdrop of the expansion of the U.S. Trustee pilot program instituted in 1979, the initial goal of which was to end the appearance of favoritism between judges and trustees whom the judges appointed and to separate administrative duties from judicial tasks.[21] *In re Sharon Steel Corp.*, 100 B.R. 767, 773 (Bankr.W.D.Pa.1989); *In re McLean Indus., Inc.*, 70 B.R. 852, 856 (Bankr.S.D.N.Y.1987).

Section 1102(a)(2) permits the court to order the appointment of an additional committee to assure adequate representation. There is no indication, upon review of the plain language of the statute, that the court is constrained in making such a determination. *McLean*, 70 B.R. at 856. The court in *McLean* undertook an exhaustive review of the legislative history of § 1102 and concluded that "Congress sought primarily to take bankruptcy judges out of the appointment process and Congress expressly retained in the bankruptcy courts the ability to decide *de novo* the question of whether additional committees are necessary to assure adequate representation." *Id.* at 857–58.

■■ The initial determination whether to appoint an additional committee is often a determination made by the U.S. Trustee. The criteria to be used by the U.S. Trustee is not set forth in 11 U.S.C. § 1102(a)(1). Here, the U.S. Trustee may appoint additional committees *if the U.S. Trustee deems it appropriate.* "Formal findings and adjudicatory procedures are not required of the U.S. Trustee." *Sharon Steel*, 100 B.R. at 786. The court, however, is instructed by 11 U.S.C. § 1102(a)(2) that it is to appoint an additional committee to *assure adequate representation.*

■ Therefore, this Court must necessarily conduct an independent review of whether there is adequate representation by an existing committee by the mandate of 11 U.S.C. § 1102(a)(2). It stands to reason that the determination of adequate representation is thus a legal determination, and the U.S. Trustee's decision is subject to *de novo* review. *See Texaco*, 79 B.R. at 566 (noting that whether request for additional committee is made to U.S. Trustee or not, the court must arrive at its own judgment). Many other courts have arrived at the same conclusion. *See, e.g., In re Dow Corning Corp.*, 194 B.R. 121 (Bankr.E.D.Mich.1996), *rev'd on other grounds*, 212 B.R. 258 (E.D.Mich.1997); *In re Public Service Co.*, 89 B.R. 1014 (Bankr. D.N.H.1988); *In re First RepublicBank Corp.*, 95 B.R. 58 (Bankr.N.D.Tex.1988). Accordingly, this Court will review the U.S. Trustee's decision not to appoint an additional committee, as sought by the Movants, *de novo.*

### DISCUSSION

■ There is no framework provided in the Bankruptcy Code for this Court to

---

**21.** Section 1102(c), which provided the court with authority to change committee membership, was repealed. At least one bankruptcy judge in this district has ruled that the court's ability to review the decision of the U.S. Trustee pursuant to § 1102(a)(1) with respect to individual members of a committee is subject to an abuse of discretion standard. *See In re Barney's, Inc.*, 197 B.R. 431, 438–39 (1996).

determine adequate representation. *McLean*, 70 B.R. at 861 ("there is no hard and fast rule"). Nevertheless, courts have generally applied a similar set of factors in analyzing the adequacy of representation.[22] Such factors are:

1. The ability of the committee to function;
2. The nature of the case; and
3. The standing and desires of the various constituencies.

*See, e.g., McLean*, 70 B.R. at 860. The analysis is without question to be determined on a case-by-case basis. Other considerations have included the ability for creditors to participate in the case even without an official committee and the potential to recover expenses pursuant to § 503(b), *In re Hills Stores*, 137 B.R. 4, 8 (Bankr.S.D.N.Y.1992); *Albero v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 68 B.R. 155, 163 (S.D.N.Y.1986); whether different classes may be treated differently under a plan and need representation, *In re Drexel Burnham Lambert Group, Inc.*, 118 B.R. 209 (Bankr.S.D.N.Y. 1990) (debt versus equity holders); the motivation of movants, *In re Orfa Corp.*, 121 B.R. 294, 295 (Bankr.E.D.Pa.1990); the cost incurred by the appointment of additional committees, *e.g., Texaco*, 79 B.R. at 566–67; and the tasks that a committee or separate committee is to perform, *McLean*, 70 B.R. at 860.

▮ Some courts have found it appropriate to divide its consideration into two components. First, the court must determine whether the appointment of an additional committee is necessary to assure the movants are adequately represented. Second, if the answer to the first question is yes, then the court must decide whether it should exercise its discretion and order the appointment. *Dow Corning*, 194 B.R. at 141; *In re Wang Labs., Inc.*, 149 B.R. 1, 2 (Bankr.D.Mass.1992). The court's ability to exercise discretion, even once inadequate representation is found, is arguably derived from the use of the word "may" in 11 U.S.C. § 1102(a)(2). *Dow Corning*, 194 B.R. at 142–43. Discretionary considerations include:

1. The cost associated with the appointment;
2. The time of the application;
3. The potential for added complexity; and
4. The presence of other avenues for creditor participation.

*Dow Corning*, 194 B.R. at 142–43; *Hills Stores*, 137 B.R. at 5–8; *Ad Hoc Bondholders Group v. Interco Inc. (In re Interco Inc.)*, 141 B.R. 422, 424 (Bankr.E.D.Mo. 1992). The burden is on the moving party to prove that the existing committee does not provide adequate representation. *Dow Corning*, 194 B.R. at 144.

▮ The decision is not to be taken lightly, and involves a delicate balancing of various and sometimes diverging interests. The formation of a creditors' committee is "purposely intended to represent the necessarily different interests and concerns of the creditors it represents." Andrew DeNatale et al., *Powers, Functions and Duties of Creditors' Committees*, 767 PLI/Comm 791, 803 (1998). As such, ordering the appointment of additional committees, particularly given that the matter is often first reviewed and addressed by the U.S. Trustee, is an extraordinary remedy.

---

**22.** The Court need not decide whether the requesting party must first exhaust administrative remedies, i.e. make application to the U.S. Trustee, prior to moving before the Court for an additional committee, inasmuch as the ENA Creditors and the Energy Traders both requested by letter to the U.S. Trustee the appointment of additional committees prior to the present motions. *McLean*, 70 B.R. at 857.

*Sharon Steel,* 100 B.R. at 778; *Texaco,* 79 B.R. at 565. In considering the factors utilized by courts in determining whether a current committee is providing adequate representation, as well as the particular facts and circumstances of this case, the Court finds here that the Creditors' Committee's representation is adequate.

■ As stated above, a strong indicator of whether a committee is able to adequately represent its constituents is its ability to function. A committee that is hopelessly divided, unable to take a position on important matters and ineffective would clearly support an argument for a separate committee. *See Hills Stores,* 137 B.R. at 6 (holding that a court may be inclined to appoint a committee where "the creditors of separate debtors had vastly conflicting aims and entitlement and had shown themselves unable to function on a single committee. . . .").

Although members of the Creditors' Committee may be creditors of separate Debtors with arguably "vastly conflicting aims and entitlement," in the matter before the Court, the Movants have not cited a single instance where the ability of the Creditors' Committee to function has been impaired. In fact, the Creditors' Committee notes that it voted unanimously in favor of opposing the appointment of additional committees.[23] Its unanimous stance is noteworthy in that the Creditors' Committee, as stated previously, is comprised of three energy traders, one of which is the Creditors' Committee co-chair, and eleven members are creditors of ENA. Furthermore, the Court assumes that the

Creditors' Committee has not voted unanimously on every issue, yet, there has never been an occasion in which an abstaining or dissenting member has advocated a position before the Court contrary to that of the Creditors' Committee. *See Sharon Steel,* 100 B.R. at 778 (denying motion to appoint additional committee where movant asserted no facts showing that committee has not reached a consensus on all important issues before it).

Nevertheless, while the composition of the Creditors' Committee is an important factor, the analysis does not end here. "The problem is that a committee may function just fine, reaching consensus on all issues, and still not adequately represent a particular group of creditors. This can occur, for instance, if the committee is so dominated by one group of creditors that a separate group has virtually no say in the decision-making process. Consequently, courts look to see whether conflicts of interest on the committee effectively disenfranchise particular groups of creditors." *Dow Corning,* 194 B.R. at 142 (citing *Sharon Steel,* 100 B.R. at 779; *In re Saxon Indus.,* 39 B.R. 945, 947 (Bankr. S.D.N.Y.1984)). However, there has been no cry from anyone on the Creditors' Committee that the Creditors' Committee is conflicted or has not permitted everyone's voice to be heard. In addition to their participation on the Creditors' Committee, the voice of the energy traders and the ENA creditors has been heard on every major issue before this Court. According to the Ad Hoc Committee's supplemental

---

**23.** The Court notes that the Creditors' Committee also voted unanimously to oppose the disqualification of Milbank, Tweed, Hadley & McCloy, LLP, as its counsel. In that motion, many of the conflicts that are argued to exist as between Enron Corp. and ENA or the energy traders are at the core of the disqualification motion; in that it was alleged that

Milbank's relationship with the various financial institutions highlights its conflicts. Further, it was made clear at the February 27, 2002 hearing that at least EXCO's counsel viewed the appointment of a separate committee linked to the issues raised by EXCO in its motion to disqualify Milbank.

motion, its efforts have produced the following results:

1. Proposed revisions to the DIP facility were included due to pressure from the Ad Hoc Committee and other energy traders.

2. The position of the Ad Hoc Committee regarding cash management was validated by the Court and the ENA Examiner.

3. Important and material concessions were made by UBS regarding the risks of predatory trading activities posed by the sale transaction.

4. The Ad Hoc Committee's efforts in filing a motion to alter or amend the UBS sale order resulted in the Court including a directive that UBS be required to comply with its representations made at the Sale Hearing.

Furthermore, as cited in the Dunhill Group's supplemental memorandum in support of an ENA creditors' committee, numerous ENA creditors, including the Dunhill Group, filed motions seeking entry of an order to restrict the Debtors' use of cash and to except ENA from the Debtors' cash management system. As previously cited, on February 25, 2002, the Court entered the Amended Cash Management Order.[24]

Wiser Oil also noted that it was instrumental in obtaining the support of other sizeable creditors of ENA for motions as follows:

1. Motion, Pursuant to § 105, Excepting Enron N.A. from Existing Centralized Cash Management System, and Directing Enron N.A. to Implement New Cash Management Sys-

tem and Provide Accounting, filed on January 17, 2002.

2. Motion for Order, Pursuant to 11 U.S.C. §§ 105 and 1104, (i) Directing the Appointment of a Chapter 11 Trustee, Examiner with Expanded Powers or Other such Fiduciary for the Estate of Enron N.A., (ii) Directing Enron N.A. to Secure and Preserve All of its Books, Records and Files Pending Such Appointment, (iii) Directing Enron N.A. to Sequester and Hold in Escrow All of its Cash and Other Monetary Receipts Pending Such Appointment, (iv) Directing Enron N.A. to Turn Over Custody of All of its Books, Records, Files and Cash and Other Monetary Receipts to the Appointed Fiduciary, (v) Directing Enron N.A. to Cooperate With the Appointed Fiduciary and (vi) Vesting the Appointed Fiduciary With The Powers Necessary to Carry Out Specified Functions, filed on January 22, 2002.

The efforts of the Movants have resulted in modifications of certain orders. With respect to the Amended Cash Management Order, there are a number of issues to consider. First, the Debtors continue to maintain that the Cash Management Order as originally entered supplied sufficient protections and was essentially a continuation of the cash management protocols that were in place prepetition and that nothing in the ENA Examiner's reports supports the concerns raised in the motion to amend the Cash Management Order. Second, the Creditors' Committee has argued that the various modifications it was proposing and the fact that they were negotiating further modifications with the Debtors were sufficient to protect the in-

---

**24.** The Dunhill Group notes that the Creditors' Committee initially objected to the modification, but eventually reversed its position and submitted a modified cash management order.

terests of all of the Debtors, and that the ENA Examiner's reports confirm the Creditors' Committee's view.

With respect to the UBS issue, the Ad Hoc Committee's efforts resulted in certain modifications to the order for the sale of the wholesale trading business. It is unclear whether the Ad Hoc Committee's efforts resulted in clarifications of protections already provided to the Debtors or in additional safeguards (that may or may not have been essential to protect the interests of the Debtors).[25] However, it *is* clear that the Movants have impacted the decisions made by the Court. Whether their efforts resulted in contributions that will ultimately be determined to be beneficial or necessary cannot be determined at this time. There is no doubt, however, that the Movants have been heard.

This is not a case where the current composition and function of the Creditors' Committee is such that one group does not have a meaningful voice. In *Sharon Steel*, debenture group members moved for appointment of a separate committee. 100 B.R. at 771. In that case, the debenture members argued that having six debenture holders on a creditors' committee of thirteen did not provide adequate representation. *Id.* at 781. The court denied the motion, noting that there is no evidence that the division on the committee has rendered the group's voice meaningless, and that the formation of a separate committee will not eliminate inherent tensions but weaken propensity to compromise. *Id.* at 779. In the matter before the Court, there is no evidence that there is any conflict on the Creditors' Committee with respect to maximizing value and no evidence that the Movants have not had a meaningful voice. Finally, the ENA Ex-

aminer was appointed as a disinterested third party to investigate and report on matters related to ENA, as previously detailed, and to act as a facilitator of an ENA plan of reorganization. The functioning and composition of the current Creditors' Committee (as well as the role of the ENA Examiner) lends support for its maintenance as the sole committee.

■ The second factor that courts often use in analyzing the adequacy of representation is the nature of the case, and there is no doubt that this is a large and complex case. As noted by the Movants, ENA standing alone is among the largest bankruptcy cases ever filed. The Movants cite the sheer size of the case as a factor supporting its position. *See In re Beker Indus. Corp.*, 55 B.R. 945, 948–49 (S.D.N.Y.1985) (large, complex cases may indicate need for additional committees representing different interests). However, the size of a case alone is not determinative. There are a variety of parties and interests in these cases, and the nature of this case is such that the simple answer of appointing additional committees may not provide a solution. But, as noted by the parties opposing the addition of separate committees, and this Court concurs, adding additional committees would likely intensify conflict and lead to further complication. This Court is disinclined to add committees to satisfy one group of creditors, a group that already has representation on the Creditors' Committee, only to create further discord, litigation and delay. As noted by the Court in *Sharon Steel*,

> [I]t is the responsibility of all members to act as fiduciaries for all creditors represented by the Official Committee ... this case will succeed or fail to the extent members of the Official Commit-

---

**25.** The Court notes that the sale was vehemently opposed by most, if not all, of the Movants, and this Court has yet to be advised of any situation in which the concerns raised by the objectors to that sale have come to fruition.

tee can adjust their differences within the framework of the existing Official Committee. The formation of a separate committee will not eliminate the inherent tensions; indeed, it will only weaken the impetus to compromise. 100 B.R. at 779. Similarly, this Court cannot imagine a case with a more compelling need for compromise and resolution. Such a result should not be at the expense of one constituency over another. Rather, with one body having a fiduciary duty to all unsecured creditors, the parties are placed on even ground in their commonality as unsecured creditors with a goal toward maximizing recovery. *See* COLLIER ON BANKRUPTCY, & 1103.05[1][a] at 1103–22 (15th ed. rev.2002)("[t]he primary purpose of a committee ... is to maximize the return to the constituency represented by the committee and all actions undertaken by the committee should be with that goal in mind."). "By using creditors' committees, the bargaining difficulties inherent in consolidating the interests of numerous unsecured creditors is simplified, and the unsecured creditors' bargaining power enhanced, by effectively treating unsecured creditors as one bargaining entity with a single bargaining agenda." J. Bradley Johnston, *The Bankruptcy Bargain*, 65 AM. BANKR.L.J. 213, 270 (1991).

▮ Conflicts among creditors and among the members of a creditors' committee are not uncommon. The question is whether such conflict hinders adequate representation. *See Dow Corning*, 194 B.R. at 145 (conflict is inherent and may facilitate negotiation); *Orfa*, 121 B.R. at 295 (denying motion to appoint additional committee where purported conflicts were not so uncommon or significant); *Texaco*, 79 B.R. at 567 (dissident factions of the

same class of creditors, i.e. unsecured creditors, are not automatically entitled to separate committees); *McLean*, 70 B.R. at 861 (presence of a potential conflict may not always require a separate committee for representation to be adequate).

Many of the cases cited above involve single-debtor entities, a small number of debtors, or a number of related debtors in a single business. It has been recognized that certain complex, multi-debtor, multi-business cases lend support for the appointment of additional committees. *See Hills Stores*, 137 B.R. at 6 (complex multi-business debtors may need more than one committee); *McLean*, 70 B.R. at 862 ("Selection of one committee for two or more jointly administered cases does give rise to the concern that the committee not be overloaded with the creditors of one debtor to the detriment of the representational needs of the creditors of another debtor."). While there are certainly multiple debtors in the matter before the Court, the way in which transactions were conducted indicate that the businesses at issue in this matter were in certain respects interrelated. This is evidenced by the various guaranties [26] and multiple claims against certain Debtors held by many of the Movants. The nature of the interrelationship is further evidenced by the way the funds were swept daily to Enron Corp. and then redistributed to various entities. As such, the operation of a single committee is not so distinct from the functioning of ENA and Enron Corp. prepetition. *But see In re Parkway Calabasas, Ltd.*, 89 B.R. 832, 835 n. 3 (Bankr.C.D.Cal.1988) (*see infra*).

Generally the issues that seem to be foremost in multi-debtor cases are those such as substantive consolidation and inter-company debts. In the matter before

---

**26.** It does not appear to be disputed that many ENA creditors have guaranties from Enron Corp.

the Court, these legal issues will be addressed, as more fully set forth hereinafter, by the ability of all parties to be heard and participate as well as by the role of the ENA Examiner and to some extent the role of the Enron Corp. Examiner.

Furthermore, the general principle regarding the ability of one committee to facilitate resolution applies, particularly in a case such as in the matter before the Court where the Creditors' Committee appears to be functioning well. A committee is a catalyst for negotiation and compromise between the parties in the reorganization process. *See Hills Stores,* 137 B.R. at 7. In *Hills Stores,* the court noted in response to the motion of bondholders for a separate committee:

> The fact that the Bondholders may not be able to protect all their interests and achieve *all* their goals is not paramount, as the ultimate aim is to strike a proper balance between the parties such than an effective and viable reorganization of the debtor may be accomplished ... inclusion of such groups within one committee may facilitate the consensual resolution of the conflicting priorities among the holders of unsecured claims and thereby facilitate the negotiation of a consensual plan.

*Id. See also Official Unsecured Creditors' Comm. v. Stern (In re SPM Mfg. Corp.),* 984 F.2d 1305, 1317 (1st Cir.1993) ("No two creditors have identical interests ... and the Code implicitly recognized that fact by providing a procedural framework for handling the various divergent interest of the parties to a bankruptcy.").

■ The standing and desires of various constituencies is a third factor to con-

sider when determining whether there is adequate representation. The U.S. Trustee denied the Movants' requests for additional committees based on the fact that all creditors on the Creditors' Committee are united in their desire to untangle the Debtors' complicated financial affairs. The issue is not whether the Creditors' Committee is an exact replica of the creditor body, but whether representation of various creditor types is adequate. *See Hills Stores,* 137 B.R. at 7 ("Nowhere does the Code mandate a committee must faithfully reproduce the exact complexion of the creditor body.").

Many of the Movants cite the entry of the Court's Interim Order on December 3, 2001, approving debtor in possession financing, as evidence of an action taken against their interests and for which they need official representation.[27] In the Interim Order, JPMorgan and Citibank were granted a lien against ENA's assets. The Movants argue that the act of encumbering previously unencumbered assets of ENA raises concerns and lends support to their motions. However, it does not appear to be disputed that one of the original purposes for entry into the debtor in possession financing was to enable the continuation of the Debtors' trading business. The continuation of the Debtors' trading business as contemplated did not come to fruition. Further, as previously referenced, the wholesale trading business was sold by order of the Court on January 22, 2002.

■ The potential for substantive consolidation of these cases is an issue at the forefront of many of the Movants' arguments.[28] The Creditors' Committee is still

---

**27.** The Creditors' Committee was not formed until December 12, 2001.

**28.** Substantive consolidation of these cases may impact many parties, including the ener-

gy traders. Their contention that the liabilities of the Trading Debtors will need to be satisfied in full before any of their assets may be distributed to Enron Corp. and its creditors does not yet appear to be disputed.

in the process of evaluating the issue and has not taken a position. As such, potential litigation over substantive consolidation at this stage is speculative. Many of the Movants cite dicta in a 1988 bankruptcy court decision for support. *See Parkway Calabasas,* 89 B.R. at 835 n. 3. In *Parkway Calabasas,* the court was considering whether a fraudulent conveyance cause of action is rendered moot by the substantive consolidation of two cases. In a footnote, the court expressed its frustration about the lack of opposition from unsecured creditors to motions for substantive consolidation. *Id.* The court adopted a presumption that it is improper to appoint a single creditors' committee where the affairs of the respective debtors appear to be substantially entangled, where assets have been transferred from one debtor to another in transactions that are not at arms length, and where creditors of the debtors have dealt with such debtor as an economic unit. *Id.; see also In re BH & P, Inc.,* 103 B.R. 556 (Bankr. D.N.J.1989). The Court disagrees with such a per se rule.

Furthermore, in the matter before the Court, there can be no doubt that the positions of the parties on substantive consolidation will be heard through their able counsel, and additionally, by virtue of the composition of the Creditors' Committee. More importantly, the underlying issues relating to inter-company debt, as well as postpetition allocation of overhead expenses, are issues in which one or both of the Examiners are involved, each having a fiduciary duty to the entities they represent. Finally, as noted by those in opposition to the motions, the justification for a separate committee just by virtue of a

potential issue over substantive consolidation would also lend support for the formation of separate creditors' committees for each of the other Debtor entities whose creditors could argue that they would fare better standing alone.

The Movants have also raised concern over the Debtors' May 3, 2002 release of the OpCo Plan.[29] Certain of the Movants are concerned that if the OpCo proposal serves as the framework for a plan of reorganization, then they would need an uncompromised professional to assess it. The formulation of a plan of reorganization is one of the most important roles of a creditors' committee. However, as previously mentioned, the Movants are represented by sophisticated, competent counsel. *See Sharon Steel,* 100 B.R. at 779 (while movants may have certain distinct interests from other creditor groups on the committee, interests are protected by existence of committee with fiduciary duty and movants' active and sophisticated counsel). Also, this Court's May 8, 2002 Order expanding the duties of the ENA Examiner provided that the ENA Examiner work with the Debtors, the Creditors' Committee, and other parties in interest to facilitate the Chapter 11 plan process for ENA and its subsidiaries as expeditiously as possible. The ENA Examiner is an impartial fiduciary, and part of his expanded role includes conferring with parties in interest concerning the formation of the ENA plan. The Court has no reason to believe that the Energy Traders and ENA Creditors will be excluded. *See Sharon Steel,* 100 B.R. at 779–80 (appointment of additional committee will not vindicate a prime function of plan formulation where

---

**29.** As previously mentioned, the OpCo Plan is the business plan proposing the formation of OpCo Energy Company to effectuate the separation of an integrated asset portfolio from the bankruptcy estate in which it has been proposed that certain assets will be sold and the remaining assets will be liquidated.

movant has not shown lack of participation in plan formulation).

Aside from the common concerns raised by the Movants and addressed previously, several of the Movants raise creditor-specific reasons for the need for an additional committee. As previously mentioned, some of the concerns raised involve skepticism over the cash management structure, which has been alleviated, *inter alia*, by the prohibition on cash sweeps from ENA.

██ The EDO Creditors contend that the U.S. Trustee was not aware of their status as beneficial holders of in excess of $900 million of claims against ENA arising from their respective holdings of securities. Even if this were the case, the U.S. Trustee has not changed her position. In any event, the EDO Creditors are also creditors of Enron Corp. However, they contend that a separate committee is necessary to protect the distinct and separate interests of creditors of different debtors, not the differing interests among creditors of a common debtor. Additionally, EXCO contends that the appointment of a separate committee for the ENA Debtor alone, pursuant to 11 U.S.C. § 1102(a)(1), is mandatory. If the arguments of the EDO Creditors and EXCO were correct, then the Court would be constrained to appoint a separate committee for each debtor in a jointly administered case. Such a mandate would be both counter-productive and costly. *McLean*, 70 B.R. at 862 ("There is no indication that Congress gave any thought to jointly administered cases and intended to require a committee for each case. The cost would be extreme.")

Cinergy raises another issue not common to all Movants. Prepetition, the Debtors entered into thousands of forward, swap and other agreements with various parties relating to the Debtors' energy trading business. Many have been terminated by the contract counter-party or the Debtors, resulting in the need for calculation of a termination payment. It was the practice of the parties to calculate and net-out exposure under the agreements on a consolidated, cross-contract and cross-affiliate basis to arrive at a single obligation for all agreements between the Debtors and the creditors. Cinergy contends that the Debtors and the Creditors' Committee will likely oppose efforts to continue such practice.

██ The Court does not believe the estate should fund a distinct group of creditors to litigate an issue that would appear to be in their interest alone and provide no benefit to the estate. On May 30, 2002, the Court entered an Order Establishing and Authorizing Procedures for Settlement of Terminated Safe Harbor Agreements (the "Safe Harbor Order"). The Safe Harbor Order provides a protocol by which the Debtor will advise the Creditors' Committee of potential agreements with counterparties on the early termination payment under a particular agreement. The protocol further requires that each termination payment agreement be submitted to the Court for approval, under expedited procedures. Accordingly, each termination payment will be determined on a case-by-case basis and each party will have an opportunity to be heard.

EXCO raises an issue concerning $8.5 billion of transactions that resulted in approximately that much debt being placed on ENA's books. EXCO argues that these are really debts of Enron Corp., or alternatively, if these debts do belong to ENA, the debts should be equitably subordinated to ENA's trade debt. The parties that purchased notes created by these transactions have organized and refer to themselves as the Ad Hoc Committee of Noteholders. The Ad Hoc Committee of Noteholders are the beneficial holders of approximately one hundred million dollars

of claims against ENA on account of their holdings of securities, secured by the EDO Securities. By virtue of their asserted claims against ENA through their pleadings, EXCO states that there will likely be major litigation over these claims and any equitable subordination issue. The presence of conflicts among ENA creditors only lends further support for the need for one creditor body to represent the interests of all unsecured creditors.

As the Creditors' Committee stands, there has been no evidence of an inability of the Creditors' Committee to function, no evidence of a breach of fiduciary duty and no evidence of a debilitating division among its members. The potential for conflict on any newly created committee, while not dispositive, again leads this Court to the conclusion that in considering the standing and desires of the various constituents, the current Creditors' Committee is best suited to provide the impetus to negotiation and resolution.[30] Furthermore, any argument that there should be a separate committee to investigate the alleged questionable transactions is alleviated by the investigating and reporting role of the ENA Examiner and the Enron Corp. Examiner with respect to such transactions.

 The question before the Court is whether the current Creditors' Committee is providing adequate representation to all unsecured creditors. Whether a particular party is successful on all of its positions is not the test, and does not necessarily mean that it is not being provided adequate representation. As previously noted, each of the Movants is represented by competent counsel. Furthermore, their voices have

been heard and have provided an impetus to several actions taken in these cases. Clearly the Movants have taken and can continue to take an active role in these cases. *See* 11 U.S.C. § 1109(b); *Dubin v. SEC (In re Johns–Manville Corp.)*, 824 F.2d 176, 179–81 (2d Cir.1987) (failure to grant the movant official committee status is not tantamount to exclusion from participation in the proceeding).

The appointment of separate committees serves no practical purpose and, for the reasons cited herein, will not achieve the outcome sought by the Movants. As previously mentioned, energy traders comprise over 20% of the current Creditors' Committee with substantial claims, and one energy trader, Williams Companies is a co-chair of the Creditors' Committee. There is no question that the energy traders have adequate representation on the Committee. In addition, eleven of the thirteen members of the Creditors' Committee also hold claims against ENA of various sizes. Similarly, there is no question that the ENA creditors are adequately represented on the Creditors' Committee.

Furthermore, it has not been denied that many of the constituents of the Energy Traders (and energy traders in general), as well as many of the ENA Creditors (and ENA creditors in general) have claims against Enron Corp. Thus, the appointment of any additional committee would be comprised of creditors with claims beyond that of ENA or the Trading Debtors. The Court does not see, for all practical purposes, the possibility of a "pure" ENA committee with a fiduciary duty solely to those with claims against any of the Trading Debtors or solely to

---

**30.** The opposition filed by the Baupost Group references other potential conflicts such as the possibility of certain energy traders cross-offsetting their claims against ENA and its

affiliates, as previously discussed, arguably diverting value from the estate of other trading Debtors.

those with claims against ENA. The only entity with the fiduciary duty solely to ENA is that of the ENA Examiner. As such, his role, in addition to the role of the current Creditors' Committee with a fiduciary duty to all unsecured creditors, assures that all interests are being considered and that there is an effective avenue toward resolution of issues.

■ The bottom line is whether the estate should fund the role of the Movants beyond that of the Creditors' Committee and the Examiners, given that there has been no evidence that there is an existing conflict with the Creditors' Committee. *Sharon Steel Corp.*, 100 B.R. at 780–81 (sole purpose of motion is to provide compensation for professionals for every undertaking, without added scrutiny of whether action taken provided a substantial contribution under § 503(b)). Added cost alone does not justify the denial of appointment of an additional committee where it is warranted. *See, e.g., Hills Stores*, 137 B.R. at 8. Nevertheless, the Court sees no reason for the appointment of additional committees based on the facts and circumstances of this case. The only missing component is the Movants' access to immediate compensation for their efforts. Their ability to be compensated has not been foreclosed, and the Movants' may file an appropriate application for administrative expense payment for substantial contribution to the estate pursuant to 11 U.S.C. § 503(b) at an appropriate time. *Id.*

The Energy Traders have not met their burden of proving that the Creditors' Committee cannot adequately represent them and express their views. Likewise, the ENA Creditors have not met their burden of proving that the current composition of the Creditors' Committee is not providing adequate representation. Discretionary factors such as cost,[31] the potential for hindering negotiation, and the appointment of the ENA Examiner, as well as the ability of each creditor to participate through its retained counsel, further support denial of the motions. Additionally, EXCO has failed to establish the need for a separate committee for ENA pursuant to 11 U.S.C. § 1102(a)(1).

Finally, UES has argued that the Court should order ENA as debtor in possession to retain separate counsel to represent them in negotiating repayment of the administrative debt owed from Enron Corp. to ENA as a result of postpetition cash sweeps. They argue that it is impossible for Enron Corp.'s attorneys to zealously advocate the interests of ENA as a postpetition administrative claimant to the bankruptcy estate of Enron Corp. while simultaneously trying to zealously represent Enron Corp. against ENA.

The Debtors object to UES' motion for separate counsel, arguing that this Court has already ruled by order entered on January 30, 2002, that Weil, Gotshal & Manges LLP's representation holds no interest adverse to the Debtors or to their respective estates as to the matters upon which it is engaged. The Debtors also argue that UES' argument is untimely, procedurally ineffective, and barred by issue preclusion and law of the case. This Court agrees with the Debtors' objections and further finds that UES has failed to establish cause for, or any benefit that would accrue by, the appointment of separate counsel for ENA.

### CONCLUSION

Accordingly, the requests for an additional energy traders' committee and the request for an ENA creditors' committee

---

**31.** *See Beker,* 55 B.R. at 949 (exercise of discretion gives rise to a concern for cost).

are denied. The motion of UES to require ENA as debtor in possession to obtain separate counsel is denied. Simultaneously herewith the Court is signing an order consistent with this Memorandum Decision.