**In re TEXACO INC., Texaco Capital Inc., Texaco Capital N.V., Debtors.**

**Bankruptcy Nos. 87 B 20142 to 87 B 20144.**

United States Bankruptcy Court, S.D. New York.

Nov. 12, 1987.

Weil, Gotshal & Manges, New York City, for debtors.

Levin & Weintraub & Crames, New York City, Baker & Botts, Houston, Tex., Stutman, Treister & Glatt, P.C., Los Angeles, Cal., for Pennzoil Co.

Kramer, Levin, Nessen, Kamin & Frankel, New York City, for General Committee.

Cleary, Gottlieb, Steen & Hamilton, New York City, for Industry Committee.

Keck, Mahin & Cate, Chicago, Ill., for Equity Committee.

Harold Jones, New York City, trustee.

**562**

## DECISION ON MOTION TO DISBAND OR MERGE THE INDUSTRY COMMITTEE

HOWARD SCHWARTZBERG,
Bankruptcy Judge.

Texaco Inc., Texaco Capital Inc. and Texaco Capital N.V., as debtors in these administratively consolidated Chapter 11 cases, have moved pursuant to U.S.C. §§ 1102(a) and 105(a) of the Bankruptcy Code for an order directing the United States Trustee to disband the Industry Unsecured Creditors' Committee (the "Industry Committee") or merge it into the General Unsecured Creditors' Committee (the "General Creditors' Committee") and to appoint such members of the Industry Committee to the General Creditors' Committee as is necessary to assure adequate representation of all creditors these Chapter 11 cases.

A hearing was held on November 10, 1987, at which time opposition to Texaco's motion was voiced by the United States Trustee, the General Creditors' Committee, the Industry Committee and Pennzoil. The Equity Committee supported Texaco's motion.

### FACTS

1. On April 12, 1987, Texaco Inc. and its two wholly-owned subsidiaries, Texaco Capital Inc. and Texaco Capital N.V., filed with this court Chapter 11 reorganization cases and thereafter continued to operate their businesses and manage their properties as debtors in possession in accordance with 11 U.S.C. §§ 1107 and 1108 of the Bankruptcy Code. Simultaneously with the commencement of these cases, the court entered an order directing that the Chapter 11 cases should be jointly administered pursuant to Bankruptcy Rule 1015(b).

2. Texaco Inc. is principally a holding company that also has oil and gas operations. The bulk of the oil and gas operations are conducted by Texaco's nonfiling subsidiaries. The Texaco subsidiaries which filed Chapter 11 cases with the parent corporation are financing entities. Texaco Capital Inc. and Texaco Capital N.V. borrow funds from third parties and loan or advance these funds to the parent corporation and its nondebtor subsidiaries.

3. Pennzoil Company ("Pennzoil") is Texaco's largest unsecured creditor. On December 10, 1985, Pennzoil obtained a judgment against Texaco in the District Court of Harris County, Texas, in excess of $10 billion. Texaco is solvent, in that the book value of its assets exceeds its liabilities, including the Pennzoil judgment.

4. On April 27, 1987, shortly after the commencement of these cases, the United States Trustee appointed statutory committees of creditors holding general unsecured claims against the debtors; The General Creditors' Committee and the Industry Committee. On July 15, 1987, the United States Trustee appointed a third committee comprised of Texaco's shareholders, known as the Equity Security Holders Committee (the "Equity Committee").

5. The General Creditors' Committee consists of seventeen voting members holding unsecured claims against the debtors, exclusive of Texaco's competitors in the oil and gas industry. The Industry Committee originally consisted of seven voting members, including Pennzoil, doing business in the oil and gas industry.

6. The Industry Committee was formed by the United States Trustee in recognition of the fact that certain sensitive information concerning Texaco's business activities which should be disclosed by Texaco to its noncompeting unsecured creditors should not be furnished to Texaco's competitors, including Pennzoil. Additionally, it was believed that Pennzoil, which holds the largest unsecured claim against Texaco, could participate more meaningfully in these cases as a member of a committee consisting solely of companies engaged in the oil and gas industry, rather than as a member of the General Creditors' Committee. Pennzoil's status differs from the other members of the General Creditors' Committee in that Texaco vigorously disputes Pennzoil's claim, whereas the claims of the members of the General Creditors' Committee are largely undisputed by Texaco.

7. On April 23, 1987, this court authorized Texaco to make royalty payments re-

lating to prepetition transactions involving Texaco's oil and gas properties (the "Royalty Order"). Pursuant to the Royalty Order, Texaco has paid approximately $86 million on account of prepetition claims of industry creditors.

8. Pursuant to an order of this court dated July 10, 1987 (the "Global Order"), Texaco was permitted to assume in accordance with 11 U.S.C. § 365, oil and gas leases and other executory contracts, including mineral servitudes, subleases, farmout agreements, operating agreements, unit agreements, joint venture agreements and exploratory agreements. Texaco was also authorized to cure all monetary defaults under these agreements, including prepetition obligations, as required by 11 U.S.C. § 365(b)(1)(A), in an aggregate amount not to exceed $55 million.

9. Following Texaco's assumption of the oil and gas agreements and the payment of any monetary defaults pursuant to the Global Order and the payment of royalties in accordance with the Royalty Order, the prepetition unsecured claims of the voting members of the Industry Committee, exclusive of disputed claims, will amount to approximately $10.1 million. As a result of these payments, two members of the Industry Committee resigned from the committee, so that there are now only five voting members on that committee, namely Pennzoil and four other corporations. There is also one *ex officio* member.

10. In a letter addressed to the United States Trustee, dated October 14, 1987, Texaco requested that the Industry Committee be disbanded or merged into the General Creditors' Committee. The Equity Committee endorsed and supported Texaco's request in a letter dated October 13, 1987. Not surprisingly, the Industry Creditors' Committee submitted a letter to the United States Trustee, dated October 14, 1987, opposing Texaco's request. Similarly, by letter also dated October 14, 1987, the General Creditors' Committee also objected to Texaco's request, mainly because they believed that the addition of Pennzoil to the General Creditors' Committee would cause a disruption of its activities in at-tempting to resolve the Pennzoil–Texaco litigation. Additional letters were submitted on behalf of Texaco and the General Creditors' Committee supplementing their positions.

11. In a letter to the interested parties dated October 16, 1987, the United States Trustee rejected Texaco's request to disband the Industry Committee and said, in relevant part as follows:

Addressing the request of the debtor to disband the industry creditors committee, the purpose of the additional committee seems as evident today as it did on April 27, 1987; namely to assure adequate representation of industry creditors, avoid needless litigation on whether or not Pennzoil should be on a committee and facilitate the smooth administration of the case. In determining not to disband the industry creditors committees it is important, based upon the facts today, to decide if the same result would have occurred when initially appointing the two committees. It appears as though the need for two committees and the purpose of two committees is still prevalent. I am not at all concerned with alleged motives, but only the facts of the case as they exist today.

With respect to the cost factors, I do not believe that a price tag should be placed on adequate representation. The debtor can have joint meetings with the two committees to reduce some expense. It also appears as though there are other large creditors who are represented by the industry creditors committee. I am still concerned about the presence of Pennzoil on the other committee and the effect it might have on the committee. This is not to intimate that conflict or divergence of view alone is reason for more than one committee. Nor do I believe that the knowledge of the members of the industry creditors committee would be lost based upon their inclusion in membership on the other committee.

Therefore, at this time I have determined not to disband the industry creditors committtee. However, as facts change, (for example, an interim distribution, depending upon the contours of

such distribution) it may be appropriate in this case to have only one creditors' committee which, includes members of the industry creditors committee despite the objection of the other committee.

12. Although Pennzoil is a member of the Industry Committee, it has acted independently at times in these cases and is represented by four law firms which have appeared at various times on its behalf. On its own motion Pennzoil has sought a Rule 2004 examination of the debtors and their executive officers. Pursuant to a decision by this court dated October 30, 1987, Pennzoil obtained a ruling directing Texaco to produce a wide-ranging volume of documents regarding Texaco's operations and its business plans.

13. Texaco asserts that the Industry Committee is no longer needed and it should not be required to absorb the cost of separately retained attorneys, accountants and investment bankers for the Industry Committee which are duplicating the activities of the attorneys, accountants and investment bankers retained by the General Creditors' Committee and those retained by the Equity Committee. Texaco states that the disclosure of sensitive business information is no longer a significant issue in these cases in light of the fact that the Industry Committee has demanded and obtained equal access to all of the information which was furnished to the General Creditors' Committee, with one exception concerning the lease of an exploration field in Alaska.

14. The costs and expenses of the Industry Committee, whose membership has now been reduced to Pennzoil and four other companies, are substantial. The Industry Committee, as well as the General Creditors' Committee and the Equity Committee, each retained the services of investment bankers to advise them with respect to the financial structure of debtors in the context of formulating a plan of reorganization. The investment bankers for the Industry Committee will incur charges of approximately $125,000 per month. For the first three months following the commencement of these cases, the debtors have incurred administrative costs and expenses attributable to the two creditors committees in excess of $2.1 million, of which approximately one-half was incurred by the Industry Committee. On an annualized basis, the administrative costs and expenses of the two creditors committees is estimated by Texaco to be over $14 million, of which $7 million would be incurred by the Industry Committee. These figures do not include the costs and expenses of the Equity Committee. The Industry Committee estimates that their annual costs will be more in the neighborhood of $3 million.

15. There has been a change in conditions with regard to the claims of oil and gas industry creditors which prompts a reconsideration of the need for the existence of a separate committee to assure adequate representation of their interests. As a result of Texaco's payments to industry creditors pursuant to the Royalty Order and the curing of defaults in accordance with the Global Order, Texaco's trade indebtedness to its creditors in the oil and gas industry will be greatly reduced, as reflected by the resignations of two companies from the Industry Committee. The need to limit Texaco's disclosure of sensitive business information to non-industry creditors is no longer a factor as far as Texaco is concerned because the same information has been furnished to both creditors committees. Furthermore, Pennzoil has acted independently and has obtained separate Rule 2004 examinations and discovery apart from the information that has been furnished to the Industry Committee.

16. That there are issues which the General Creditors' Committee believes should be discussed without Pennzoil being present does not bear on the issue of the need on the part of industry creditors for adequate representation. It is not uncommon for members of a committee of unsecured creditors to have divergent views with respect to a proposed reorganization. Some creditors may be friendly towards a debtor and favor reorganization, whereas others may be unalterably hostile and seek a liquidation plan. Although some of the items on the General Creditors' Committee's agenda will naturally concern meth-

ods for dealing with Pennzoil's claim, these matters may be discussed separately at a time when Pennzoil is asked not to be present, or by a subcommittee assigned specifically to address the treatment of Pennzoil's claim. Surely, the sophisticated counsel and creditors in this case are capable of handling this aspect fairly and diplomatically.

17. The existence of a separate oil and gas industry committee of unsecured creditors is no longer justified simply as a means for keeping Pennzoil off the General Committee of unsecured creditors. Indeed, Pennzoil has stated in support of its requested discovery and examinations under Rule 2004 that it must act independently because its interests are not the same as those of the other members of the Industry Committee, whose claims are substantially smaller and not disputed by Texaco.

18. The continued need on the part of oil and gas industry unsecured creditors for vigorous representation by representatives with unique knowledge and expertise will not be lost by a merger of the two unsecured creditors committees. Indeed, when added to the General Creditors' Committee, the remaining industry representatives will be able to participate on that committee so as to supplement the views of the other unsecured creditors who represent various trades and industries.

19. A merger of the two committees of unsecured creditors will not diminish the rights of oil and gas industry creditors to have adequate representation because the remaining industry representatives will continue to assure the industry creditors of adequate representation, but such merger will substantially reduce the gigantic and duplicative administration costs and expenses that will be incurred in these cases.

## DISCUSSION

The concept of merging one creditors' committee with a second duly appointed creditors' committee is an unusual one. However, one does not usually find two separate committees of unsecured creditors in one case. That this novel issue should arise in these administratively consolidated cases is not surprising in light of the heatedly contested skirmishes between the parties which preceded the Chapter 11 filings. The Texaco–Pennzoil dispute has already played to audiences of state and federal judges on the trial and appellate levels, including the United States Supreme Court. Although this problem is unusual, it may be resolved by applying the standards delineated under Section 1102 of the United States Bankruptcy Code.

## AUTHORITY OF THE COURT

In accordance with the 1986 Amendments to the Bankruptcy Code, as contained in the Bankruptcy Judges, United States Trustees, and Family Farmer Bankruptcy Act of 1986, Pub.L. No. 99–554 (Oct. 27, 1986), the United States Trustee, rather than the court, in the former nonpilot areas, is now assigned the administrative task of appointing committees of creditors and appointing a committee of equity holders if the circumstances warrant such an appointment. 11 U.S.C. § 1102(a)(1). Any parties in interest who disagree with the United States Trustee's administrative decisions are authorized to apply to the court for an order directing the United States Trustee to appoint additional committees to assure adequate representation. This point is expressed in 11 U.S.C. § 1102(a)(2) as follows:

\*    \*    \*    \*    \*    \*

(2) On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The United States trustee shall appoint any such committee.

The Bankruptcy Code is silent as to the elimination or merger of creditors' committees that were previously appointed by the United States Trustee. Any requests for changes in the membership or size of previously appointed committees may now be addressed to the United States Trustee, in accordance with the administrative duties exercised by that office. This aspect has been made clear by the 1986 Amendments

with the deletion of former subsection (c) in 11 U.S.C. § 1102 which previously read:

(c) On request of a party in interest and after notice and a hearing, *the court* may change the membership or the size of a committee appointed under subsection (a) of this section if the membership of such committee is not representative of the different kinds of claims or interests to be represented.

(Emphasis added).

The legislative history accompanying the 1986 Amendment of 11 U.S.C. § 1102 states:

Section [221] amends 11 U.S.C. 1102 to transfer the authority to appoint the Chapter 11 committee of unsecured creditors from the court to the U.S. Trustee, as it is an administrative task. *The court still retains the authority to order the appointment of such additional committees as are necessary,* but the U.S. Trustee has the authority to actually appoint these committees once the court has ordered.

(Emphasis added). H.R.Rep. No. 99–764, 99th Cong.2d Sess. 28 (1986), U.S.Code Cong. & Admin.News 1986, p. 5227.

■ Accordingly, it follows that if upon request of an interested party, the United States Trustee does not agree to change the membership or the size of a committee previously appointed under 11 U.S.C. § 1102(a), such party may apply to the court for such relief. The appointment of one committee of creditors holding unsecured claims against a Chapter 11 debtor is mandated under 11 U.S.C. § 1102(a)(1) if there are creditors willing to serve. However, the United States Trustee's appointment of a second committee of creditors holding unsecured claims is not required but may be made by the United States Trustee as a matter of administrative discretion, based upon existing conditions at the time of appointment. This point is expressed in 11 U.S.C. § 1102(a)(1) as follows:

As soon as practicable after the order for relief under chapter 11 of this title, the United States trustee shall appoint a committee of creditors holding unsecured

claims and may appoint additional committees of creditors or of equity security holders as the United States deems appropriate.

■ The issue of adequate representation is one which is ultimately entrusted to the courts to decide upon an application made by a party in interest. This issue is determined on a *de novo* basis after the administrative task of appointing committees is performed by the United States Trustee. *In re McLean Industries, Inc.,* 70 B.R. 852, 859 (Bankr.S.D.N.Y.1987). An abuse of discretion standard does not apply with respect to the United States Trustee's initial exercise of discretion because the concept of adequate representation is a legal issue which must be resolved judicially. *In re McLean Industries, Inc.,* 70 B.R. at 860–863. Hence, the court's determination as to the adequacy of representation within the meaning of 11 U.S.C. § 1102(a)(2) is not an administrative review because this decision is committed to the court on a *de novo* basis. There is no requirement under 11 U.S.C. § 1102(a)(2) that an interested party must first submit such a request to the United States Trustee. Therefore, whether or not such a request was first submitted to the United States Trustee, the court must arrive at its own judgment, although the court may consider reasons advanced by the United States Trustee in the event that such a request was previously submitted to the United States Trustee.

### REQUESTED MERGER OF TWO UNSECURED CREDITORS' COMMITTEES

■ This court agrees with the United States Trustee's position that a price tag should not be placed on adequate representation. However, a suggestion that the "debtor can have joint meetings with the two committees to reduce some expenses" elides the point that the Industry Committee has retained attorneys, accountants and investment bankers at a substantial expense to these estates which duplicates the astronomical fees already being incurred by the attorneys, accountants and investment bankers for the General Creditors'

Committee, not to mention the additional fees that are being incurred by the attorneys, accountants and investment bankers for the Equity Committee. All of these professionals are examining the affairs and financial reports of an admittedly solvent and prosperous oil giant, which does not have any major dispute with any creditor other than Pennzoil. Moreover, Pennzoil has taken an independent stance apart from that of either creditors' committee and has elected to conduct its own examination of Texaco's financial affairs and plans. In these circumstances, and in light of the reduction of the indebtedness to the industry creditors as a result of the Global Order and the Royalty Order and in view of the resignations of two of the original seven members of the Industry Committee, it appears that the purpose for the existence of a separate Industry Committee no longer exists.

Texaco does not now contend that the Industry Committee should receive any less sensitive financial information than is already flowing to the General Creditors' Committee. Indeed, any future conflicts as to the furnishing of confidential information to the General Creditors' Committee or the presence of Pennzoil at any of its meetings where such presence might be disruptive of affairs, can be handled judiciously by the parties, or if not, by the court.

The issue of adequate representation on the part of unsecured oil and gas industry creditors should not be confused with the desire of some to keep Pennzoil off the General Creditors' Committee. A separate committee of unsecured industry creditors should not exist mainly as a vehicle to perform this function. Dissident factions of the same class of creditors are not automatically entitled to separate committees. *In re Becker Industries Corp.*, 55 B.R. 945 (Bankr.S.D.N.Y.1985); *In re Salant Corp.*, 53 B.R. 158 (Bankr.S.D.N.Y. 1985); *In re Baldwin–United Corp.*, 45 B.R. 375 (Bankr.S.D.Ohio 1983); *In re Saxon Industries*, 39 B.R. 945 (Bankr.S.D.N.Y. 1984). The members of a committee of unsecured creditors need not have parallel interests in order to qualify for membership on the committee. *In re Schatz Federal Bearings Co., Inc.*, 5 B.R. 543 (Bankr. S.D.N.Y.1980).

The original conditions which justified a separate committee of unsecured creditors composed solely of oil and gas industry companies have changed since the commencement of these cases. A merger of the two committees of unsecured creditors will not detract from the concept of adequate representation for industry creditors because the same representatives will continue to act as members of the General Creditors' Committee. Their voices will be heard and their expertise will be shared by all of the unsecured creditors. On the other hand, the debtors' estates will be relieved of the additional financial burden of supporting two separate groups of attorneys, accountants and investment bankers performing duplicative services for two committees of the same class of creditors.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(A).

2. Texaco has established that the reasons for appointing two separate committees of the same class of creditors, namely the General Creditors' Committee and the Industry Committee, no longer exist.

3. The substantial reduction of the amounts owed by Texaco to the creditors in the oil and gas industry and the concomitant depletion in the ranks of the membership of the Industry Committee, when viewed in the light of the duplication of administrative costs and expenses that will be incurred by the attorneys, accountants and investment bankers retained by the committee, justify the merger of its members into the General Creditors' Committee.

4. The unsecured creditors of the debtors in the oil and gas industry will be adequately represented by a merger of their representatives on the General Creditors' Committee, because the General Creditors' Committee represents the same class

of creditors, namely the general unsecured creditors of the debtors.

5. The United States Trustee is directed to appoint all of the members of the Industry Committee as members of the General Creditors' Committee.

SETTLE ORDER in accordance with the foregoing Findings of Fact and Conclusions of Law.