### In re WILLIAMS COMMUNICATIONS GROUP, INC. and CG Austria, Inc., Debtors.

### No. 02–11957 (BRL).

United States Bankruptcy Court, S.D. New York.

July 24, 2002.

Lowenstein Sandler, P.C. by Michael S. Etkin, Roseland, NJ, Sulmeyer, Kupetz, Baumann & Rothman, P.C., by Ronald E. Gordon, Victor A. Sahn, Los Angeles, CA, for shareholders.

Jones, Day, Reavis & Pogue, by Corinne Ball, Erica M. Ryland, Fordham E. Huffman, Fedra Fateh, New York City, for debtors.

White & Case, LLP, by Thomas Lauria, New York City, for The Williams Companies.

United States Trustee, by Pamela Jean Lustrin, New York City.

Kirkland & Ellis, by James H.W. Sprayregen, P.C., Richard L. Wynne, Michael A. Cohen, New York City, for the Official Creditors' Committee.

Clifford Chance Rogers & Wells, by David S. Sullivan, Margot B. Schonholtz,

Scott D. Talmadge, New York City, for Bank of America.

## MEMORANDUM DECISION AND ORDER DENYING MOTION FOR APPOINTMENT OF AN EQUITY COMMITTEE

BURTON R. LIFLAND, Bankruptcy Judge.

Shareholders (the "Shareholders" or the "Movants") holding approximately twelve percent of the issued and outstanding common stock of Williams Communication Group, Inc. ("WCG"), move this court[1] to order the appointment of an equity security holders committee ("equity committee") pursuant to section 1102(a)(2) of title 11, United States Code (the "Code"). The Debtors (as defined below), the United States Trustee for the Southern District of New York (the "UST"), the official committee of unsecured creditors (the "Creditors' Committee"), Bank of America, N.A., and The Williams Companies, Inc. ("TWC") object to the relief requested.

**Background**

On April 22, 2002 (the "Petition Date"), WCG and CG Austria, Inc. ("CGA" and together with WCG, the "Debtors") filed separate petitions for relief under chapter 11 of the Code. WCG is a non-operating holding company whose principal asset is its ownership of Williams Communications, LLC ("WCL"). WCL has not commenced a chapter 11 case and continues to operate outside of bankruptcy in the ordinary course of business. WCG, and its direct and indirect subsidiaries (the "Company"), has built a fiber-optic broadband network in the United States spanning more than 30,000 route miles and connecting 125 cities. The Company, with its approximately 3,200 employees worldwide, services the bandwidth intensive needs of high capacity communications providers and offers a comprehensive global service platform for data, Internet, satellite, voice, and cellular communications. WCG is the indirect parent corporation of CGA, a non-operating holding company that owns the stock of a foreign company, Williams Participations Holdings, GmBH.

Until 1999, WCG was a wholly-owned subsidiary of TWC, an energy services company. In October 1999, TWC completed an initial public offering and certain related private placements of WCG's common stock, which left TWC with approximately 98% of the voting power of WCG. On April 23, 2001, TWC distributed approximately 95% of the common stock held by TWC to TWC's shareholders in a tax-free spin-off (the "Spin Off"), making WCG a fully independent company.

For the fiscal year ending December 31, 2001, WCG reported consolidated revenues of $1.19 billion and a consolidated net loss of $3.81 billion, inclusive of asset impairment and restructuring charges. The Debtors' balance sheet at December 31, 2001, consisted of consolidated assets and liabilities in the amount of $5.99 billion and $7.15 billion, respectively. As of April 22, 2002, its verified schedules of assets and liabilities totaled $3.68 billion and $6.3 billion, respectively.

WCG's liability structure consists of approximately $2.5 billion in publicly traded unsecured Senior Redeemable Notes (the "Notes"). In addition, TWC has asserted unsecured claims in the amount of $2.3 billion representing obligations arising from TWC's guarantees of certain debt of WCG or WLC issued prior to the Spin–Off. CGA has no unsecured creditors.

---

1. An initial hearing was held before Chief Judge Bernstein on June 27, 2002 (the "June 27 Hearing"). Judge Bernstein subsequently recused himself and the case was reassigned to me.

The Debtors owe approximately $775 million of secured debt to the Bank of America.

Prior to the commencement of these chapter 11 cases, the Company reached agreements (the "Restructuring Agreements") with TWC, the company's prepetition secured lenders, and holders of approximately $875 million of WCG's Notes (the "Noteholders"), regarding the terms and conditions on which a chapter 11 plan would provide for the financial restructuring and de-leveraging of WCG's balance sheet. On May 20, 2002, the Debtors filed a joint chapter 11 plan (the "Plan") and related disclosure statement (the "Disclosure Statement") reflecting the provisions of the Restructuring Agreements.

Pursuant to the Plan, the claims of the Noteholders and TWC will be recast as 100% of newly issued common stock of WCG. As a result, the Plan will cancel and discharge the equity existing prior to confirmation. The only debt remaining will be that owed to the secured lenders (the "Bank Group").

*Request to Appoint an Equity Committee*

In a letter dated April 23, 2002, Victor Sahn, counsel to certain WCG shareholders, requested that the UST appoint an equity committee.[2] The UST declined to consider the issue until after an official creditors' committee was appointed. On May 2, the UST appointed a nine member Creditors' Committee.

On May 6, the UST sent a letter to Debtors' counsel and to Creditors' Committee's counsel requesting each party's position with respect to Mr. Sahn's request for an equity committee. On May 13, the Debtors (the "Debtors' Response") and the Creditors' Committee (the "Creditors' Committee Response") informed the UST of their opposition to the appointment of an official equity committee. Additionally, the Securities and Exchange Commission (the "SEC") advised the UST, by letter dated May 14, 2002 (the "SEC Correspondence"), that it, too, opposed[3] the appointment of an equity committee.

On May 17, the UST concluded that there was no equity in the estate and, therefore, no basis for forming an official equity committee. The UST based its decision on the analysis of the record contained in the Debtors' Response, the Creditors' Committee's Response, the SEC Correspondence, the Debtor's 8–K and 10–K filings with the SEC and the Bankruptcy Rule 1007–2 affidavit.

The Movants contend that the UST erred in its decision not to appoint an equity committee and seek an order from this Court to appoint such a committee.

**Discussion**

█ The UST, when it "deems appropriate," may appoint an equity committee pursuant to section 1102(a)(1) of the Code. The permissive language ("may") of the statute indicates that the UST's authority to appoint such a committee is discretionary. If the UST does not appoint an equity committee, any party in interest may request the court to order such an appointment "if necessary to assure adequate representation of . . . equity security holders." 11 U.S.C. § 1102(a)(2). The bankruptcy court reviews the UST's deci-

---

**2.** Mr. Sahn supplemented the request for an equity committee, by letters dated April 24, May 1, and May 8. The supplemental requests included further detail and analysis supporting the appointment of an equity committee as well as a list of willing shareholders to serve on it.

**3.** At the June 27 Hearing, however, the SEC stated it had no formal position with respect to the appointment of an equity committee.

sion *de novo.* *In re McLean Ind.,* 70 B.R. 852, 858 (Bankr.S.D.N.Y.1987); *In re Texaco,* 79 B.R. 560, 566 (Bankr.S.D.N.Y. 1987).

■ The Code does not define what constitutes "adequate representation." Instead, the court retains the discretion to appoint an equity committee based on the facts of each case. *Albero v. Johns–Manville Corp. (In re Johns–Manville Corp.),* 68 B.R. 155, 159 (S.D.N.Y.1986); *In re Beker Indus.,* 55 B.R. 945, 948 (Bankr. S.D.N.Y.1985); *In re Wang Lab., Inc.,* 149 B.R. 1, 2 (Bankr.D.Mass.1992). Generally, the courts have structured the analysis around the following factors: the number of shareholders, the complexity of the case, and whether the cost of the additional committee significantly outweighs the concern for adequate representation. *Albero v. Johns–Manville,* 68 B.R. at 159–160; *Beker,* 55 B.R. at 948–951; *Wang,* 149 B.R. at 1.

■ The appointment of an equity committee raises *cost* concerns since such appointments are "closely followed by applications to retain attorneys and accountants." *In re Saxon Indus., Inc.,* 39 B.R. 945, 947 (Bankr.S.D.N.Y.1984). Essentially, the courts employ a balancing test to weigh the cost of an equity committee versus the "concern for adequate representation." *Wang,* 149 B.R. at 3. In this analysis, the court may consider intangible costs, such as delay, *Albero v. Johns–Manville,* 68 B.R. at 160, as well as examining whether the equity holders' interests are already being represented by other committees. *Id.* at 162–164; *In re Baldwin–United Corp.,* 45 B.R. 375, 376 (Bankr.S.D.Ohio 1983).

■ In addition, the debtor's solvency is a major factor when considering the cost of appointing an equity committee. *Wang,* 149 B.R. at 3; *Beker,* 55 B.R. at 950–951;

*In re Emons, Indus.,* 50 B.R. 692, 694 (Bankr.S.D.N.Y.1985). When a debtor appears to be hopelessly insolvent, an equity committee is not generally warranted "because neither the debtor nor the creditors should have to bear the expense of negotiating over the terms of what is in essence a gift." *Emons,* 50 B.R. at 694. As a result of the absolute priority rule, equity holders of a hopelessly insolvent debtor will receive no distribution. 11 U.S.C. § 1129(b)(2)(B). As such, the shareholders have no economic interest left to protect, and any distribution would amount to a gift.

■ The Movants contend that an equity committee should be appointed in these cases because they are not adequately represented. The Movants argue that this Court cannot declare the Debtors to be hopelessly insolvent without a determination of its reorganization value. In addition, the Movants claim that the Debtors are not hopelessly insolvent because equity holders would receive a distribution if the TWC claims of $2.3 billion were to be subordinated or recharacterized as equity. Alternatively, the Movants argue that an equity committee should be appointed even though it appears that the Debtor is hopelessly insolvent.

Although there is no clear litmus test, it is clear that the Debtors *appear to be hopelessly insolvent.*

First, the Debtors' balance sheet, as of the Petition Date, listed their assets and liabilities as $5.99 billion and $7.15 billion, respectively. As of April 22, 2002, the Debtors' verified schedules of assets and liabilities were listed as $3.68 billion and $6.30 billion, respectively. Clearly, the Debtors' liabilities exceed their assets by billions of dollars—a useful, though not exclusive, indicator of insolvency.

Second, WCG's publicly held bonds are trading at a steep discount on the market—another useful, though not exclusive, indicator of insolvency. As of the Petition Date, such bonds were trading for approximately 15% of face value. At the June 27 Hearing, the court was informed, without objection from the Movants, that the same bonds were presently trading at 6% of face value. Even if TWC claims were disallowed, or taken out of a distribution scheme, unsecured creditors would still only get stock valued less than twenty cents on the dollar.

Third, there is no cash distribution under the proposed plan. Instead of cash or debt, over one-third of the Noteholders have agreed to settle billions of dollars in claims in exchange for equity in the reorganized WCG. This is a telling agreement since the opportunity for unsecured creditors to receive cash or restructured debt, for even a portion of their claim, would almost certainly have been seized. Instead, the Noteholders have accepted the highly uncertain value of common stock.

Fourth, the Creditors' Committee has conducted significant due diligence with respect to the Debtors and WCG's reorganization value. Moreover, the unsecured creditors have similar motivations, as discussed below, with the Shareholders to critically examine the Debtors' and banks' valuations. A higher valuation is in both the Creditors' Committee's and Shareholders' interest.

Fifth, one of the conditions of the Restructuring Agreements for WCG to successfully confirm a plan and emerge from bankruptcy is the requirement to obtain $150 million in subordinated financing or new equity. The requirement for this significant capital infusion is indicative of the Debtors poor financial condition.

For all of these reasons, I find that the Debtors appear to be hopelessly insolvent.

The Movants, however, argue that the UST could not have made a determination, from the facts before it, that the Debtors were "hopelessly insolvent" within the context of the *Emons* decision. That is, it is not just a simple reference to the balance sheet. *Wang,* 149 B.R. at 3. Instead, the Movants argue that the true test of the value of a debtor's assets is by looking at its reorganization value as set forth in *Consolidated Rock Products Co. v. Du Bois,* 312 U.S. 510, 525–26, 61 S.Ct. 675, 85 L.Ed. 982 (1941). Thus, the Movants contend that reorganization value must be determined by the entity's future earnings potential, and not by the debtor's balance sheet or how the capital markets have valued the company's securities.

Nowhere in the *Emons* decision, or other courts recognizing that decision, does it mandate a finding by the court that the debtor *is* hopelessly insolvent. Instead, the language is whether the debtor "appears to be hopelessly insolvent." *Emons,* 50 B.R. at 694. This Court has made a determination that WCG and CGA appear to be hopelessly insolvent based on many different factors. The Debtors' balance sheet and market value were two such factors, but so are the host of other indicia of the Debtors' financial health set forth above. Regardless of the method used, the result will "rarely, if ever, be without doubt or variation." L. King Collier on Bankruptcy ¶ 1129.06[3] (15th Ed. Rev., 2001).

Valuation is a proper issue for confirmation, and no determination for this motion is binding on a subsequent determination. In short, this Court has not made a valuation, nor is one necessary at this stage. Instead, it has reached a practical conclusion, based on a confluence of factors, that the Debtors *appear to be* hopelessly insolvent. At the June 27 Hearing, the Credi-

tors' Committee made a representation that the reorganization value was believed to be well less than $1 billion. To the extent that that valuation is incorrect, the Creditors' Committee, as discussed below, has the economic incentive, and fiduciary duty, to examine and find the highest realistic valuation. Accordingly, this Court finds it reasonable to conclude that the Debtors appear to be hopelessly insolvent for the purposes of determining whether an equity committee should be appointed.

Nonetheless, the Movants argue that there is at least the possibility of solvency. That is, if TWC's claims are subordinated or recharacterized as equity, then the shareholders may be entitled to some recovery. This argument, however, falls short. First, the Movants have not offered any evidence to support the notion that TWC claims can be subordinated or recharacterized. Instead, they merely point to the Creditors' Committee 2004 Motion suggesting the possibility of such subordination or recharacterization of TWC claims. Even if TWC's claims were subordinated to the Noteholders, it would still remain senior to equity and equity holders would still receive no recovery. Further, even if TWC's claims were subordinated or recharacterized as equity, or disallowed altogether (rank speculation), the Noteholders' recovery would increase twofold to an amount still short of a 20% recovery, while the equity holders would still be entitled to no distribution.

█ Relatedly, the fact that the Noteholders may double their recovery by subordinating and recharacterizing TWC claims, further undermines the necessity of an equity committee. The Creditors' Committee has a significant economic interest, as noted above, in investigating the TWC claims, notwithstanding its fiduciary obligation to do the same. In this context, the Creditor's Committee and Shareholders have similar interests with respect to investigating TWC claims. *Baldwin*, 45 B.R. at 376.

Indeed, the Creditors' Committee has already taken significant steps in investigating TWC claims and its relationship with the Debtors—a task that need not be duplicated by an equity committee. Shortly after the Petition Date, the Creditors' Committee filed a Bankruptcy Rule 2004 motion for discovery in connection with TWC and an additional 2004 motion to compel discovery from the Debtors. After TWC contested the motion, the parties reached a stipulated agreement whereby TWC provided over 200 boxes of documents relating to the relationship between TWC and the Debtors, inclusive of the transactions and agreements between them. As a result, the Creditors' Committee has had an entire team of attorneys in Tulsa for weeks examining TWC's document production. These lawyers are expected to continue the investigation notwithstanding speculation that TWC claims may be subject to ongoing negotiations. In addition, depositions pursuant to the stipulated agreement are scheduled to commence this month.

The importance of TWC claims to the Creditors' Committee is further underscored by its formation of a subcommittee, that confers weekly, to deal specifically with the TWC issues. It should also be noted that even before the Petition Date, the creditors spent a significant amount of time analyzing and investigating the public filings, disclosures and agreements with respect to TWC and WCG. Attorneys were sent to TWC's headquarters in Tulsa pre-petition, as well.

Thus, even if the Court were to discount the fact that the disallowance of TWC claims would not result in a recovery for equity holders, the Creditors' Committee has sufficiently aligned or parallel inter-

ests with the Shareholders to preclude the need for an additional committee. It is instructive to note that the statutory focus of section 1102(a)(2) is not whether the shareholders are "exclusively" represented, but whether they are "adequately" represented. *In re Edison Brothers Stores, Inc.*, 1996 WL 534853, *4 (D.Del.1996). Moreover, the Shareholders are not precluded from participating in theses proceedings.

Alternatively, the Movants argue that an equity committee should be appointed despite the Debtors' "hopeless insolvency." In support of this proposition, the Movants refer to an SEC memorandum filed in support of a motion to appoint an equity committee in the currently pending Kmart Corp. chapter 11 case, which in salient aspects is quite dissimilar from this one.[4]

It should be noted that the SEC has not submitted any brief in these cases and it has taken no formal position.[5] Nonetheless, the cases cited by the Movants by oblique reference to the SEC Kmart memorandum, while perhaps germane to that case, are either not applicable or distinguishable from the cases here.

■ Finally, while there is a large number of shareholders, not every case with such a large number will require an official equity committee. *Wang*, 149 B.R. at 2. Indeed, if Congress' intent was otherwise, it would have mandated the appointment of equity committees instead of leaving it within the discretion of the UST and the Court. *Albero v. Johns–Manville*, 68 B.R. at 160. Moreover, the appointment of an equity committee would clearly cause a delay in this case. *See, Albero v. Johns–*

*Manville,* 68 B.R. at 164; *See also, In re Kalvar Microfilm, Inc.,* 195 B.R. at 601 (declining to appoint an equity committee where plan already submitted and only remaining purposes would be for valuation and plan issues). Further delay is antithetical to an overarching need to preserve or enhance asset value. This is especially so where as here, the current market place is continually devaluing the type of assets under the Debtors' umbrella.

**Conclusion**

■ The appointment of official equity committees should be the rare exception. Such committees should not be appointed unless equity holders establish that (i) there is a substantial likelihood that they will receive a meaningful distribution in the case under a strict application of the absolute priority rule, and (ii) they are unable to represent their interests in the bankruptcy case without an official committee. The second factor is critical because, in most cases, even those equity holders who do expect a distribution in the case can adequately represent their interest without an official committee and can seek compensation if they make a substantial contribution in the case.

In this regard, the Movants are by no means left without any recourse since "the right to be heard is, at this point, as important a right as any ascribed to an official committee." *Albero v. Johns–Manville,* 68 B.R. at 164. Section 1109(b) of the Code allows an equity security holder to raise and be heard on any issue in the case. The Movants have already demonstrated their ability to organize and par-

---

4. It should be noted that Kmart's financial statements, after filing petitions for bankruptcy, revealed more than $6 billion of equity in the company.

5. Initially, the SEC Correspondence indicated its opposition to the appointment of an equity committee. However, at the June 27 Hearing, the SEC indicated that such opposition was only the result of a preliminary investigation.

ticipate in this case with skill and zeal through the prosecution of this motion and the opposition to the Restructuring Agreements. Should the Shareholders' efforts result in a substantial contribution to the estate, they may be reimbursed pursuant to section 503(b)(3)(D) of the Code. Thus, the Movants may still be heard in this case, but not at the estate's expense without a showing of substantial contribution in the case.

In light of the foregoing, the motion to appoint an equity committee is denied.

IT IS SO ORDERED.